TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
PATRICK M. RISKEN
Assistant Attorney General
P.O. Box 201401
Helena, MT 59620-1401
T: 406.444.2026
dales@mt.gov
prisken@mt.gov

JEFFREY M. HINDOIEN
Special Assistant Attorney General
Montana Secretary of State
P.O. Box 202801
Helena, MT 59620-2801
T: 406.444.6197
Jeffrey.Hindoien@mt.gov

Counsel for Defendant

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

|  |  |
|---|---|
| THOMAS BRECK, DANIELLE BRECK, and STEVE KELLY | CV 17-36-M-BMM |
| Plaintiffs, | |
| v. | **DEFENDANT'S BRIEF IN OPPOSITION TO MOTION FOR TRO AND PRELIMINARY INJUNCTION** |
| COREY STAPLETON, in his official capacity as Secretary of State of the State of Montana, | |
| Defendant. | |

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………3

EXHIBIT LIST ……………………………………………………………….4

I.    PROCEDURAL BACKGROUND……………………………………….6

II.    STATUTORY FRAMEWORK ………………………………………….7

III.    FACT BACKGROUND – CURRENT STATUS …………………………11

IV.    ARGUMENT

    A.    Preliminary Injunction Standard …………………………………17

    B.    Special Considerations …………………………………………...18

    C.    The Plaintiffs Are Not Entitled to Any Mandatory Injunction Directing the Placement of Their Names on the Ballot……..…………………………………………………….21

V.    CONCLUSION ……………………………………………………………29

# TABLE OF AUTHORITIES

## Cases

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127, 1135 (9th Cir. 2013) …………………………………….. 18

*Arizona Secretary of State's Office v. Feldman*
    137 S. Ct 446, 196 L. Ed. 2d 326 ……………………………………….20

*Colon-Marerro v. Conty-Perez*
    703 F.3d 134 (1st Cir. 2012)……………………………………………….20

*Feldman v. Reagan*
    843 F.3d 366 (9th Cir. 2016)………………………………………18, 19, 20

*Garcia v. Google, Inc.*
    786 F.3d 733 (9th Cir. 2015) ……………………………………..19, 22

*Hall et al. v. Merrill et al.*
    No. 2:13cv663-MHT (M.D. Ala. 2016) …………………………………..24

*Jones v. McGuffage*
    921 F.Supp.2d 888 (N.D. Ill. 2013) ……………………………………… 25

*Kelly et al. v. Johnson*,
    No. CV-08-25-BU-SEH (D. Mont. 2008) ………………………..6, 7, 21, 28

*Lair v. Bullock*
    697 F.3d 1200 (9th Cir. 2012) ……………………………………..20, 22, 29

*Nader v. Keith*
    385 F.3d 729 (7th Cir. 2004) …………………………………………….29

*Ne. Ohio Coal For the Homeless v. Blackwell*
    467 F.3d 999 (6th Cir. 2003) …………………………………………….20

*Purcell v. Gonzalez*
    549 U.S. 1 (2006)………………………………………………………..19

*Reynolds v. Sims*
    377 U.S. 533 (1964) …………………………………………………………19

*Serv. Emps. Int'l Union Local 1 v Husted*
    698 F.3d 341 (6th Cir. 2012) …………………………………………….20

*Stanley v. Univ. of Southern California*
    13 F.3d 1313 (9th Cir. 1994) …………………………………………………19

*Shell Offshore, Inc. v. Greenpeace, Inc.*
    709 F.3d 1281, 1291 (9th Cir. 2013) …………………………………………18

*Veasey v. Abbott*
    830 F.3d 216 (5th Cir. 2016) …………………………………………………20

*Williams v. Rhodes*,
    393 U.S. 23 (1968) …………………………………………………………….20

*Winter v. Natural Resources Defense Council, Inc.*
    555 U.S. 7 (2008) …………………………………………………...17, 18

## United States Code

42 U.S.C. §§ 1973ff …………………………………………………………14

## Mont. Code Ann.

Mont. Code Ann. §§ 13-10-501 *et seq.* ……………………………………..9, 10

Mont. Code Ann. § 13-10-601 …………………………………………..8 - 11

Mont. Code Ann. § 13-21-101 *et seq.*…………………………………………14

Mont. Code Ann. §§ 13-25-201 *et seq.* ……………………………………7 – 10

//

## **EXHIBIT LIST**

Exhibit A:   *Memorandum and Order*, *Kelly et al. v. Johnson,* No. CV-08-25-BU-SEH, May 25, 2012, Doc. 130

Exhibit B:   *Memorandum and Order*, *Kelly et al. v. Johnson,* No. CV-08-25-BU-SEH, October 9, 2008, Doc. 51

Exhibit C:   Declaration of Derek Oestreicher (March 31, 2017)

## I.  PROCEDURAL BACKGROUND

The Court has been asked by the Plaintiffs to halt, enjoin and then alter the structure of Montana's first special election to fill a vacancy in its sole Congressional seat in nearly half a century.  Mr. Breck advises that he is the nominee of the Montana Green Party to fill that vacancy, and Ms. Breck advises that she is a member of the Montana Green Party and would like to have the opportunity to vote for Mr. Breck in the May 25th special election.  (*Verified Complaint*, Doc. 1 at ¶¶ 7-8).

Mr. Kelly advises that he ran for Congress as an independent candidate in 1994 and wants to run as an independent candidate again in the May 25th special election.  (Doc. 1 at ¶ 8).   This is not Mr. Kelly's first challenge to Montana's ballot access scheme for independent candidates, and it is not his first attempt to gain access to a federal election ballot through an injunctive relief order from this Court.  *See Kelly et al. v. Johnson*, No. CV-08-25-BU-SEH, Doc. 17 at 15 ("The requested injunction would simply require the defendant [Secretary of State] to put Plaintiff Steve Kelly on the ballot in the November [2008] election.").

Although Judge Haddon ultimately concluded in May of 2012 that a discrete portion of Montana's ballot access scheme for independent candidates was constitutionally infirm (i.e., a March filing deadline) [*See Memorandum and Order,* May 25, 2012, Exhibit "A", Doc. 130 at 21-22], Judge Haddon properly

denied Mr. Kelly's last-minute request that he (i.e., Judge Haddon) order his placement on the November 2008 ballot for the Senate seat then held by Senator Baucus. *See Memorandum and Order*, October 9, 2008, Doc. 51 [attached hereto as Exhibit "B"]. As outlined more fully below, Mr. Kelly and the Brecks have not demonstrated – and cannot demonstrate -- that they are entitled to the last-minute drastic remedy of having this Court "order" their placement on the ballot for the special election on May 25th. Their request for an injunction to that effect should be summarily denied.

## II. STATUTORY FRAMEWORK

This lawsuit involves a very narrowly focused constitutional challenge to Montana's statutory framework that governs the placement of candidates on the ballot for a special election to fill a vacant Congressional seat. Under Mont. Code Ann. §§ 13-25-203(1) and (2), the Governor is required to "immediately order an election" to fill that vacancy, and the election must generally be held "no less than 85 days and no more than 100 days from the days from the date on which the vacancy occurs." (*See* Declaration of Derek Oestreicher, ¶ 5, attached hereto as Exhibit "C")

Under §13-25-205(1), "each political party shall choose a candidate according to the rules of the party", and nominations by parties "must be made no later than 75 days before the date set for the election." In terms of independent

candidates, "[n]ominating petitions may be filed by independent candidates for the office up to 5 p.m. of the 75th day before the election." § 13-25-205(2). (Oestreicher Dec., ¶ 6).

As properly noted by the Plaintiffs (Doc. 1 at ¶ 13), a political party can nominate its candidate for inclusion on the ballot in one of two ways under § 13-10-601:

- A "qualified" party (i.e., a party that had a candidate for statewide office in either of the last two general elections who received a total vote that was 5% or more of the total votes cast for the most recent successful candidate for governor) may nominate its candidates through its own selection process[1]; or

- A party that is not "qualified" under the criteria set forth above can become "qualified" to nominate its candidates through its own selection process by submitting a petition signed by a number of registered voters equal to 5% or more of the total votes cast for the successful candidate for governor at the last general election or 5,000 electors, whichever is less.

(Oestreicher Dec., ¶ 7).  Any party that seeks to qualify itself to place a nominee on the ballot through the petition process, however, must secure those 5,000

---

[1] This is in the specific context of a special election.  In a normal election cycle, a "qualified" party would be entitled to have its general election nominee selected through a primary election process under § 13-10-601.

signatures in a certain geographical distribution (more than 1/3 of the 100 legislative districts), with a certain minimum number in each district.  § 13-10-601(2)(b).  Finally, any petitions would need to be filed with local election administrators for signature verification at least 82 days before the date of the election under § 13-10-601(2)(c), because the local election administrators are obligated to "forward the verified petition" to the Secretary of State by the applicable filing deadline – in the case of a Congressional special election, that deadline is 75 days before the filing deadline for the special election under § 13-25-205(2).  (Oestreicher Dec., ¶ 7).

In terms of an "independent" candidate – or the candidate of a "minor party" that does not qualify itself for the ballot through the petition process described above – such candidates can secure a place on the ballot through a "petition for nomination" under § 13-10-501.  That petition process has a quantitatively and qualitatively different signature requirement than the petition process for "qualifying" a minor party for ballot access.  Specifically, a nominating petition under § 13-10-501 must ultimately contain signatures totaling 5% or more of the total votes cast for the successful candidate for the same office in the last general election, but there are no geographical distribution requirements for those signatures.  § 13-10-502(2).  (Oestreicher Dec., ¶ 8).  In the specific context of this

special Congressional election, 5% of the total votes cast for Congressman Zinke in November of 2016 was 14,268. (Doc 1, ¶ 22).

Again, however, any "petition for nomination" must be submitted to local election administrators for signature verification "at least 1 week before the deadline for filing" with the Secretary of State under § 13-10-503(1), and the filing deadline for a congressional special election is 75 days under § 13-25-205(2). Hence, for any "petition for nomination" by an independent candidate or by a minor party candidate whose party did not separately qualify itself for the ballot as described above, that petition document would have to be submitted to the local election administrators no later than 82 days prior to the date of the congressional special election. (Oestreicher Dec., ¶ 9).

So, in summary, the "pathway" for access to the ballot for a special congressional election in Montana is as follows:

- A "qualified" party can place its candidate on the ballot through its own selection rules and the filing of a nominating petition with the Secretary of State no later than 75 days before the election date (§§ 13-25-205 and 13-10-601);

- A minor party can "qualify" itself to place its candidate on the ballot through that same process through the filing of a nominating petition containing a

minimum of 5,000 signatures with an appropriate geographic distribution (§§ 13-25-205 and 13-10-601);

- An independent candidate -- or candidate of a minor party that did not seek to "qualify" itself through petition -- can secure a place on the ballot through the filing of a "petition for nomination" that contains signatures totaling a minimum of 5% of the total votes cast for the last successful candidate for that office, with no geographic distribution requirement (§§ 13-25-205(2) and 13-10-502).

## III.   FACT BACKGROUND – CURRENT STATUS

In terms of the current situation, President-Elect Trump officially nominated Montana Congressman Ryan Zinke to serve as Secretary of the Interior on Thursday, December 15, 2016.  Less than a week thereafter (December 21st), at least one media source was acknowledging that any independent candidate for Congressman Zinke's vacant seat would be required to secure petitions with 14,268 signatures and file those petitions at least 75 days before the election.[2]

On January 19th, newly-elected Secretary of State Corey Stapleton published two specific items on his website to provide information about the potential special

---

[2]See http://www.krtv.com/story/34109228/democrat-curtis-more-gop-candidates-surface-for-zinke-seat

election to the parties, prospective candidates and to the public in general. (Oestreicher Dec., ¶ 10). Those items consisted of:

- A six (6) page item entitled *Candidate Filing Information* found under the "Filing Information and Forms for candidates" link ; and

- A one (1) page item entitled *2017 U.S. Representative Special Election Information* found under the "Fact Sheet for candidates" link.

(Oestreicher Dec., ¶ 10); *See also* http://sos.mt.gov/elections.

Both of those items described the statutory processes outlined above, and squarely noted that "[t]here is no earliest date to gather petition signatures" for either (1) party qualification petitions or (2) candidate petitions, and "no earliest date" to begin gathering petition signatures. (Id.) In other words, by mid-January, the Secretary of State had publicly announced both (1) what the statutory timeframes were going to be for purposes of any petition-based access to the ballot and (2) the fact that interested candidates and parties were free to begin gathering signatures at any point in time. (Oestreicher Dec., ¶ 11).

Approximately one week later (January 26th), Mr. Kelly contacted the Secretary of State's office to discuss the process for filing for any special Congressional election. Mr. Kelly specifically asked the question of when signature gathering could begin, and Mr. Oestreicher advised him that there was no "earliest date" to begin, i.e, that he could begin gathering them whenever he

wished. (Oestreicher Dec., ¶ 12). Mr. Oestreicher directed Mr. Kelly to the website information referenced above, and Mr. Kelly advised that he was going to "think about" filing. (Id.)

Approximately five weeks later, on Wednesday, March 1, 2017, the U.S. Senate confirmed Secretary Zinke's appointment and, on that same day, he submitted his resignation from Congress effective immediately. (Doc. 1, ¶ 10). That same day, Governor Bullock issued a *Writ of Election* setting the date of the special election to fill the vacancy for May 25, 2017 – 85 days from the date of the vacancy. (Doc. 1, ¶ 11).

On the same day, the Office of the Secretary of State published a calendar based on the Governor's selected timeline, with that calendar initially showing a deadline for the submission of petition signatures to county election administrators for verification of Friday, March 3rd. The Secretary of State subsequently changed that calendar to reflect a deadline of Monday, March 6th in accordance with the requirements of § 1-1-307, MCA. (Doc. 1, ¶¶ 20-21). In any event, the deadline for the submission of petition signatures was properly identified as March 6th, which was five (5) days after the Governor's action in setting the election, but over 70 days after Congressman Zinke's nomination as Secretary of Interior was announced.

//

As part of that same election schedule, the Secretary of State set April 10, 2017 as the deadline for the mailing of ballots to overseas voters, including absent active duty armed forces and overseas personnel. That process is undertaken in accordance with the Montana Absent Uniformed Services and Overseas Voter Act found at §§ 13-21-101 *et. seq.*, which is in turn the product of the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), 42 U.S.C. § 1973ff *et seq.* (Oestreicher Dec., ¶¶ 13 -14). Under that structure, absentee ballots for this election must be sent out not later than 45 days in advance of the election.

The Secretary of State certified the ballot for this special election on March 13, 2017, after which the local election administrators were required to "have the official ballots prepared" under § 13-12-201. This process involves preparation of drafts of the ballots, review of the drafts by the Secretary of State's Office in conjunction with the counties to ensure compliance with the statewide uniformity requirements found in § 13-12-202, development and review of final ballot information, and county submission of the information to a professional printer for printing. (Oestreicher Dec., ¶ 15).

Once the ballots are prepared, they are submitted to a printing company for printing by each individual county. Most counties in Montana use Election Systems and Software (ES&S) as a ballot printing vendor, and those counties were scheduled to provide their ballot layout approval to ES&S by March 24, 2017 in

preparation for this special election.  (Oestreicher Dec., ¶ 16).  However, all but

three of the forty-seven ES&S counties had provided their ballot layout approval to

ES&S well in advance of that March 24th date.  (*Id.*)

In fact, based on the information provided to the Office of the Secretary of

State, 39 of the ES&S counties had already had their approved ballots printed by

ES&S prior to the initiation of the present lawsuit on March 22nd.  (Oestreicher

Dec., ¶ 16)  As of this point in time, it is the understanding of the Office of the

Secretary of State that approximately 40 of Montana's 56 counties have already

printed their ballots, for a total of approximately 410,000 ballots.  It is also the

present understanding of the Office of the Secretary of State that no ballots were

printed by ES&S subsequent to the point in time that the election administrators

became aware of the lawsuit on March 23rd and the time of a March 27th email to

the administrators advising them to hold off on any further printing. (Oestreicher

Dec., ¶ 17).

Under normal circumstances, it requires seven to ten days to account for the

time necessary for the counties to prepare, print, and receive their ballots.

(Oestreicher Dec., ¶ 18).  Any decision to issue an injunction requiring the

placement of Mr. Kelly's and Mr. Breck's names on the ballot would require the

local election administrators to now re-format the ballot.  This is a complex task

because the law requires that the order in which the candidates are listed on the

ballot be rotated so all candidates are placed in the first position on the ballot roughly the same number of times.  (Oestreicher Dec., ¶ 19).

Changing the ballot rotation for this particular Congressional race to add a fourth, fifth or even a sixth candidate[3] would require that the order of listing the names on the ballot would have to be re-rotated.  This complex re-formatting process would further delay the time required to finalize the content of the ballot if the Court were to issue an injunction requiring a change in the ballot at this point, and further delay the delivery of absentee ballots to absent military and overseas voters as required by UOCAVA.  (Id.)

In light of that, the Office of the Secretary of State has already initiated a dialogue with the U.S. Department of Defense Federal Voter Assistance Program (FVAP) and has initiated the development of a draft waiver request for submission to FVAP depending upon the outcome of the pending injunctive relief request. (Oestreicher Dec., ¶ 20).  Because of the late filing of the lawsuit, even if the Court denies the injunction request those counties that have not yet printed may need additional time to complete the printing of their ballots and transmit them to their UOCAVA voters.  If the Court grants the injunction request, however, all 56

---

[3] Shortly before the filing of this Brief, the Plaintiffs' filed an First Amended Complaint (Doc. 14) seeking to have a third individual (Doug Campbell) added to the ballot.  Like Mr. Kelly and Mr. Breck, Mr. Campbell filed an *Independent, Minor Party, or Indigent Candidate Declaration, Oath of Candidacy, and Petition for Nomination* document with no verified petition signatures.

counties will need additional time to reformat, approve and print new ballots and all 56 counties will need additional time to secure those ballots and transmit them to their UOCAVA voters. (Id.)

Finally, even apart from the delay issues and perhaps even more importantly, any last minute changes in the content of the ballot that would result from an injunction would require the majority of Montana counties to re-print their ballot stock. As indicated above, that printed ballot stock right now consists of approximately 410,000 ballots, and it is the Office of the Secretary of State's understanding that re-print costs for that many ballots would likely exceed $100,000. (Oestreicher Dec., ¶ 21).

## IV. LEGAL ARGUMENT

### A. *Preliminary Injunction Standard*

The Plaintiffs are asking this Court to issue an Order -- a preliminary injunction -- directing the placement of Mr. Kelly's and Mr. Breck's name on the ballot for a special Congressional election to be conducted in approximately 55 days. A preliminary injunction, however, is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The generally applicable *Winter* standard requires a plaintiff seeking a preliminary injunction to establish that (1) he or she is likely to succeed on the merits; (2) that

he or she is likely to suffer irreparable harm in the absence of preliminary relief;

(3) that the balance of equities tips in his or her favor; and (4) that an injunction is

in the public interest.  *Id.* at 20.

A plaintiff must make a showing as to each of those four elements, although

in the Ninth Circuit "if a plaintiff can only show that there are serious 'questions

going to the merits' – a lesser showing than likelihood of success on the merits –

then a preliminary injunction may issue if the 'balance of hardships tips sharply in

the plaintiff's favor', and the other two *Winter* factors are satisfied."  *Feldman v.*

*Reagan*, 843 F.3d 366, 375 (9th Cir. 2016) (quoting *Shell Offshore, Inc. v.*

*Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).  In other words, "'serious

questions going to the merits' and a balance of hardships that tips sharply towards

the plaintiff can support issuance of a preliminary injunction, so long as the

plaintiff also shows that there is a likelihood of irreparable injury and that the

injunction is in the public interest."  *Alliance for the Wild Rockies v. Cottrell*, 632

F.3d 1127, 1135 (9th Cir. 2011).

### B.     *Special Considerations*

This case does not, however, involve a straightforward request to the Court

for a preliminary injunction.  First, the injunctive relief sought here is an Order

from the Court directing a drastic change in the status quo, i.e., the discarding and

reprinting of hundreds of thousands of ballots – the Plaintiffs are not simply asking

for an Order that maintains the status quo. As such, their burden here is "doubly demanding", and they are required to establish that the law and facts *clearly* favor their position, not simply that they are likely to succeed on the merits. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emph. in original). A mandatory injunction of the type requested here "goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored." *Id.* (quoting *Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1984).

On top of the "doubly demanding" standard that the Plaintiffs need to meet here to support the issuance of a mandatory injunction, this case also involves a request for such an injunction in the context of an ongoing election process. When faced with a request to interfere with a state's election laws "just weeks before an election", federal courts are "required to weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction", considerations specific to election cases. *Feldman*, 846 F.3d at 375 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam)). As noted in *Feldman*:

> . . . These considerations often counsel restraint. In the context of legislative redistricting, for example, the Supreme Court has long cautioned that "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief . . . even though the existing apportionment scheme was found invalid." *Reynolds v. Sims*, 377 U.S. 533, 585, 84 S. Ct. 1362, 12 L. Ed. 2nd 506 (1964). Similarly, the Supreme Court has declined to order the printing of new ballots at a "late date" even where the existing ballots were held to have unconstitutionally excluded certain candidates. *Williams v. Rhodes*, 393

U.S. 23, 34, 89 S. Ct. 5, 21 L. Ed. 2nd 24 (1968). We have also declined on equitable grounds to interfere with the mechanics of fast-approaching elections. *See Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012) (staying a district court's injunction "given the imminent nature of the election"); *Shelley*, 344 F.3d at 919 (declining to enjoin an imminent recall election). And we are not alone in doing so. *See, e.g., Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) ("[T]he district court should fashion an appropriate remedy in accord with its findings; provided, however, that any remedy will not be made effective until after the November 2016 election."); *Colon-Marrero v. Conty-Perez*, 703 F.3d 134, 139 n.9 (1st Cir. 2012) (noting that "even where plaintiff has demonstrated a likelihood of success, issuing an injunction on the eve of an election is an extraordinary remedy with risks of its own"); *Serv. Emps. Int'l Union Local 1 v. Husted*, 698 F.3d 341, 345 (6th Cir. 2012) ("As a general rule, last-minute injunctions changing election procedures are strongly disfavored."); *Ne. Ohio Coal. For the Homeless v. Blackwell*, 467 F.3d 999, 1012 (6th Cir. 2006) (vacating in part a temporary restraining order that "needlessly creates disorder in electoral processes)

*Feldman*, 843 F.3d at 375-76.[4]

### C. The Plaintiffs Are Not Entitled to Any Injunction Directing the Placement of Their Names on the Ballot

In terms of the *Plaintiffs' Brief in Support of Their Motion for a Temporary Restraining Order and Preliminary Injunction* (Doc. 4), it is remarkable more for what it omits than for what it contain. First, it is devoid of **_any_** acknowledgement that Plaintiff Kelly was before this Court less than a decade ago litigating over the

---

[4] The cited language comes from the initial panel decision affirming the District Court's decision denying the requested preliminary injunction. Shortly thereafter, an *en banc* panel voted 6-5 to grant the injunction pending the appeal. *Feldman*, 843 F.3d at 367-370. Less than 24 hours later, however, the U.S. Supreme Court summarily granted the Arizona Secretary of State's application to stay the Ninth Circuit's injunction, effectively reinstating the initial panel's decision affirming the District Court's denial of the preliminary injunction. *Arizona Secretary of State's Office v. Feldman*, 137 S. Ct. 446, 196 L. Ed. 2d 326, 2016 U.S. LEXIS 6715.

issue of the 5% signature requirement as an alleged burden on ballot access,

including a last minute request to Judge Haddon that he be judicially-placed on the

ballot for the 2008 Senate election.  (*See* attached Exhibit "A").  It is also devoid of

any acknowledgement that Judge Haddon has already rejected (on its merits)

Plaintiff Kelly's argument that – in the context of a standard primary and general

election cycle - the 5% signature requirement is unconstitutional:

> Montana, like every other state, has a right to require independent
> candidates to make a "showing of a significant modicum of support" in
> order to qualify for placement on the ballot.  <u>Munro</u>, 479 U.S. at 193-94; see
> also <u>Anderson</u>, 460 U.S. at 788-89 n. 9.  The 5% signature requirement
> undeniably accomplishes this interest by directly measuring a candidate's
> level of popular support.  It "ensur[es] that only bona fide independent
> candidates with a measure of support gain ballot access."  <u>Swanson v.
> Worley</u>, 490 F.3d 894, 911 (11th Cir. 2007).  It also prevent[s] frivolous
> candidates from clogging the ballot and confusing voters."  Id.  The burden
> imposed by the 5% signature requirement is not severe.  Montana's
> important state interest of requiring each candidate on the ballot have a
> modicum of support is sufficient to justify the burden.  It is not
> unconstitutional.

*See Memorandum and Order*, May 25, 2012, 08-CV-25-SEH, Doc. 130, pp. 9-10.

Second, the *Plaintiffs' Brief* is devoid of **<u>any</u>** reference to any of the legal

standards that actually apply in the Ninth Circuit to a request for a mandatory

injunction in the context of an imminent election.  Rather, it erroneously suggests

that the only standard to be applied by the Court here is the 4-factor *Winter*

standard.  (Doc 4. at p. 6).  The *Brief* then goes on to spend eleven (11) pages

addressing the "likelihood of success on the merits" and "irreparable harm"

prongs, and one (1) page of text addressing the "balancing the equities" and "public interest" prongs.

As noted above, however, the legal standard to be met here in the Ninth Circuit for the issuance of this type of mandatory injunction is not simply the *Winters* test alone, nor is it even the alternative "serious questions going to the merits" / "balance of hardships tipping sharply" test as referenced in *Feldman* case. The Plaintiffs are not asking this Court to maintain the status quo *pendente lite* – they are asking for a mandatory injunction, and the burden for that type of request in the Ninth Circuit is "doubly demanding." *Garcia*, 786 F.3d at 733. They are required to establish that the law and facts *clearly* favor their position, not simply that they are likely to succeed on the merits. *Id.* (emph. in original).

As such, their ten (10) pages of argument directed at the "success on the merits" standard isn't even directed at the proper legal standard here. Moreover – and perhaps most importantly – none of their arguments in support of their request for a mandatory injunction address the Ninth Circuit case law concerning the standards for the issuance of such an injunction ***in the context of an imminent election***. As recognized in *Feldman*, that context – in and of itself – "counsels restraint" and the Ninth Circuit has further recognized – in the specific context of setting aside an injunction issued late in Montana's 2012 election process – "the

public's substantial interest in the stability of its electoral system in the final weeks leading to an election." *Lair*, 697 F.3d at 1202.

The Plaintiffs' have properly recognized that their "merits" issue in this case is a narrow one, i.e., whether Montana's ballot access structure for minor parties, minor party candidates and independent candidates – when overlaid with the tight timelines for a federal special election – creates an unconstitutional barrier to accessing the ballot. Their "merits" case is not, however, as strong as they would suggest in their *Brief*.

First, at least in terms of Plaintiff Breck, they have failed to acknowledge that the Green Party could have qualified itself for the ballot with as few as 5,000 signatures and then placed Breck on the ballot as its nominated candidate in the same fashion as the qualified parties have placed their candidates on the ballot. That is not the same qualitative or quantitative "burden" as the 14,268 signature requirement that they've focused solely on in their *Brief* and arguments.

Second, the Plaintiffs themselves acknowledge and "emphasize" that their "merits" claim is a narrow "as-applied" challenge to the ballot-access process in the specific context of the 85-day timeline ordered by Governor Bullock:

> It is important to re-emphasize here that this is an as-applied challenge. It might be a different case, for example, if Governor Bullock had exercised his discretion to call the election at the last possible day allowed under Montana law rather than the first. This case does not present the question of whether the 5% requirement can never be applied in a special election in Montana.

*See Plaintiffs' Brief*, p. 8 n. 4 (Doc. 4). If – as the Plaintiffs' *Brief* suggests – this really might be a "different case" with a 100-day timeline as opposed to the current 85-day timeline, then the Plaintiffs certainly cannot demonstrate that the law and facts "clearly favor" their position for purposes of any entitlement to a mandatory, last-minute injunction in a statewide election proceeding. Put differently, if the constitutional "burden" line for ballot-access truly rests somewhere between 85 and 100 days, this case is far too close to call on its merits to support the issuance of any injunction at this point.

Third, even the case authorities cited by the Plaintiffs in support of their "success on the merits" argument do not support the issuance of any mandatory injunction. For example, in the *Hall v. Merrill*[5] case that the Plaintiffs' cite as "[t]he leading case in the context of a special election", the District Court denied the very same type of last-minute injunctive relief request by Mr. Hall to have his name placed on the ballot, and the Eleventh Circuit affirmed the denial of that injunctive relief request on the grounds "that the injury to the public from the issuance of an injunction would far outweigh any injury [Hall] might suffer." *See Hall*, Doc. 81 at pp. 17-18. In short, for purposes of the issue presently before this

---

[5] *Hall et al. v. Merrill et al.*, No. 2:13cv663-MHT (M.D. Ala. Sept. 30, 2016) (Thompson, J.) (Doc. 81)

Court, i.e., a request for a last-minute mandatory injunction in an ongoing election

process, *Hall* stands for the proposition that such a request should be denied.

The same can be said of the other key case cited by the Plaintiffs in support

of their "merits" argument, *Jones v. McGuffage*, 921 F.Supp.2d 888 (N.D. Ill.

2013).  Although the District Court in that case did actually issue a preliminary

injunction, it ***did not*** issue an injunction granting the type of relief that Mr. Kelly

and Mr. Breck are asking for here, i.e., a judicially-directed placement on the ballot

for the election.  Rather, the District Court in *Jones* squarely recognized that

neither (1) simply placing the candidates on the ballot nor (2) dropping the

signature requirement to a fraction of a percent were an appropriate form of

injunctive remedy in this context:

> The final question is the appropriate remedy.  The Court has already rejected
> the prospect of an injunction that extends the petition-gathering period.  So
> too will it reject out of hand the other relief plaintiffs suggested:  placing
> them on the ballot or holding them to the .5% signature requirement
> applicable to the Republican primary contenders (525 signatures).  Both of
> these remedies would effectively remove any barrier to ballot access.  That
> would fly in the face of the Supreme Court's consistent refrain that states
> have a valid – even "compelling" interest in requiring any candidate for
> office to first show a substantial modicum of support.  *See Munro*, 479 U.S.
> at 194 ("*Jenness* and *American Party* establish with unmistakable clarity that
> States have an 'undoubted right to require candidates to make a preliminary
> showing of substantial support in order to qualify for a place on the ballot.").

*Jones*, 921 F. Supp.2d at 902.  Rather, the *Jones* Court ultimately directed that the

State of Illinois could not require any more than 3,444 signatures as a condition of

ballot access, as opposed to the 15,682 signatures that Illinois' 5% requirement would have otherwise dictated. *Id.*

All of which leads to the key point here -- the Plaintiffs have not demonstrated – and cannot demonstrate – that they are entitled to an injunction from this Court that would require the shredding of over 400,000 already-printed ballots, and the production of 400,000+ new ballots with their names on them. There is a reason that the Plaintiffs' *Brief* devotes less than a page of text to the legal standards that are really at play here, i.e., a balancing of equities and consideration of the public's interest. That reason is because there is simply nothing equitable or in the public's interest about directing the re-printing of hundreds of thousands of ballots at this point in time, and nothing equitable or in the public's interest about layering yet another substantial cost and burden on the already resource-strapped county election offices across Montana. Likewise, there is nothing equitable or in the public's interest about creating a complicated and burdensome UOCAVA-waiver process to facilitate the delay that would be caused by directing the re-printing of ballots at this point.

In short, there is **absolutely nothing** from the standpoint of equity or the public's interest that supports the issuance of the type of mandatory injunction the Plaintiffs' are asking for. Notwithstanding the fact that they had weeks to do so, neither Mr. Kelly nor Mr. Breck bothered to collect and submit ***any*** petition

signatures to local election administrators for verification.  On p. 12 of their *Brief*, the Plaintiffs assert that "further adding to the burden [of signature gathering]" is the fact that the past three months – the three months following the election of Donald Trump to serve as President of the United States over Hillary Clinton -- have been a time of "low voter interest" and a period of time when voters were "pay[ing] much less attention to politics."  This is the same time period during which Helena hosted a "Women's March" that had in excess of 10,000 "disinterested" citizens gathered on the front lawn of the State Capitol.[6]  That "Women's March" also occurred at a point in time (January 21st) after which both Mr. Kelly and Mr. Breck were well aware of the requirement to gather signatures to access the ballot for the special election.

Finally, there is no readily apparent reason that this lawsuit could not have been filed in early January, a point in time when the Legislature might actually have had time to consider and address a contention that the ballot-access scheme for the prospective Congressional special election was constitutionally deficient. For that matter, there is no readily apparent reason why the lawsuit could not have been filed even when the vacancy actually occurred, instead of waiting until over two-thirds of the counties had already printed their ballots.

---

[6] See http://billingsgazette.com/news/state-and-regional/montana/montana-womens-march-draws-an-estimated/article_3a0ecafe-62c6-546d-99bc-e88b0a984249.html

In September of 2008, Plaintiff Kelly was standing before Judge Haddon on the UOCAVA deadline date asking for the very same relief that he and Mr. Breck are now asking for from this Court, i.e., a last-minute injunction to place their names on the ballot of an election that is already well underway.  As Judge Haddon properly noted at that point:

> The balance of hardships similarly does not, on the record before the Court, weigh in Plaintiff's favor.  An injunction requiring that Kelly's name be added to the . . . election ballot, at this late date, would create chaos for the election administrators as the entire ballot would have to be reformatted after many have already been printed.  In would cause election officials to be unable to meet the statutory deadlines for making absentee ballots available for overseas and absent military personnel . . . , and would create a serious risk that many members of the military serving abroad may not have sufficient time to receive ballots, vote and return them to election officials in time to be counted . . . Conversely, Plaintiffs have produced no evidence that they will suffer material hardship if Kelly's name is not placed on the ballot.  Any hardship Plaintiffs may incur results directly from their own lack of diligence in pursuing this action."

(*See* Exhibit "A", pp. 6-7).  The only difference between now and September of 2008 is that Mr. Kelly will be standing in front of this Court next Tuesday approximately 6 days ahead of the UOCAVA deadline instead of the day of the deadline itself.  Nothing else is different, and the same result should obtain here – Mr. Kelly's and Mr. Breck's request for a last-minute injunction directing the placement of their names on the ballot of an election already well underway should be summarily denied.

//

## <u>CONCLUSION</u>

This case involves a classic example of what Judge Posner properly characterized as a lawsuit filed "gratuitously late" in an election process, and a circumstance where an injunctive relief order directing the placement of a candidate's name on the ballot "would throw the state's preparations for the election into turmoil."  *See Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004).  In any calculus that involves the appropriate legal analysis, i.e., an assessment under the Ninth Circuit's "doubly demanding" standard for issuing a "particularly disfavored" mandatory injunction, and the application of that standard in the specific context of a last-minute request to enjoin an already moving election process, the required outcome here is clear.

What has to win out here in the end is precisely what the Ninth Circuit acknowledged in *Lair* when it properly refused to allow a last-minute injunction to affect the 2012 general election, i.e., the Montana public's "substantial interest in the stability of its electoral system in the final weeks leading to an election."  For the reasons set forth above, the Secretary of State respectfully requests that the Court DENY the *Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction* (Doc. 3).

//

//

DATED this 31st day of March, 2017.

TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
PATRICK M. RISKEN
Assistant Attorney General

JEFFREY M. HINDOIEN
Special Assistant Attorney General
Montana Secretary of State


By: /s/ Jeffrey M. Hindoien
Jeffrey M. Hindoien

Counsel for Defendant


## CERTIFICATE OF COMPLIANCE PURSUANT TO
## L.R. 7.1(d)(2)(E)

I hereby certify that, pursuant to Local Rule 7.1(d)(2), the attached *Brief in Opposition to Plaintiffs' Motion for TRO and Preliminary Injunction* is proportionately spaced, has a typeface of 14 points or more and contains approximately 6,150 words, excluding the caption, certificate of compliance, table of contents and authorities, and exhibit index.

By: /s/ Jeffrey M. Hindoien
Jeffrey M. Hindoien

Counsel for Defendant