## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

|  |  |
|---|---|
| THOMAS BRECK, DANIELLE BRECK, DOUG CAMPBELL, and STEVE KELLY | CV-17-36-M-BMM |
| Plaintiffs, | |
| vs. | **ORDER REGARDING MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| CORY STAPLETON, in his official capacity as Secretary of State of the State of Montana, | |
| Defendant. | |

## I. Overview

Plaintiffs assert that the State of Montana has established unconstitutional ballot access laws as applied to the upcoming special election for the United States House of Representatives. Plaintiffs consist of three people who seek to run in the special election as a minor party candidate or as independent candidates and a voter who wishes to cast her vote for one of these candidates. The three candidates'

names will not appear on the special election ballot unless the Court intervenes on their behalf.

Plaintiffs have filed a Motion for Temporary Injunction and Preliminary Injunction ("Motion for TRO"). (Doc. 3.) Plaintiffs argue that Montana's signature requirement for minor and independent party candidates to be placed on the ballot represents an unconstitutional barrier to ballot access. (Doc. 4 at 10.) Plaintiffs seek a TRO to prevent the Montana Secretary of State, Cory Stapleton, from enforcing the signature requirement for ballot access in the special election. (Doc. 3.) Plaintiffs also request that the Court order the Montana Secretary of State to print all of the candidates' names—Thomas Breck, Steve Kelly, and Doug Campbell—on the special election ballot. (Doc. 3.) The State of Montana, through its top election officer, Secretary of State Cory Stapleton ("the State"), opposes Plaintiffs' motions.

## II. Factual Background

Montana's former United States Representative Ryan Zinke resigned from office on March 1, 2017, in order to assume his duties as Secretary of the Interior. (Doc. 4 at 3.) Montana Governor Steve Bullock on the same day ordered a special election to fill the at-large congressional seat left vacant by Secretary Zinke. *Id.* Governor Bullock scheduled the special election for May 25, 2017, the earliest date allowed by Montana law. *Id.*, citing Mont. Code Ann. § 10-25-203.

The Montana Green Party nominated Plaintiff Thomas Breck ("Breck") as its candidate for the special election. (Doc. 4 at 5.) Plaintiff Steve Kelly ("Kelly") seeks to run as an independent in the special election. *Id.* Plaintiff Doug Campbell ("Campbell") also seeks to run as an independent in the special election.

Montana law requires minor parties to submit a nominating petition containing 5,000 signatures in order for their chosen candidate to appear on the ballot. Mont. Code Ann. §§ 13-25-205 and 13-10-601. An independent candidate, or a candidate of a minor party who failed to collect 5,000 signatures, must file a nominating petition containing signatures totaling at least five percent of the votes cast for the last successful candidate for the office at issue. Mont. Code Ann. §§ 13-25-205(2) and 13-10-502. The five percent signature requirement for the May 25, 2017, special election would require 14,268 signatures, according to this formula. (Doc. 4 at 5.)

Nominating petitions containing the requisite amount of signatures were due to the Montana Secretary of State's office on March 6, 2017. *Id.*, citing Mont. Code Ann. §§ 13-25-205(2), 13-10-503, 1-1-307. The three candidates timely submitted nominating petitions to the Montana Secretary of State. Neither Breck, nor Kelly, nor Campbell, submitted a nominating petition that contained the required 14,268 signatures. (Doc. 4 at 6.) As a result, the Secretary of State refuses to place the names of any of the three candidates on the ballot.

Plaintiffs filed their Complaint on March 22, 2017. (Doc. 1.) Plaintiffs allege that Montana's ballot access laws violate the First and Fourteenth Amendments of the United States Constitution. (Doc. 4 at 6.) Plaintiffs seek declaratory relief and a permanent injunction against enforcement of the signature requirement for ballot access in special elections. Plaintiffs on the same day filed a motion for a TRO and PI. Plaintiffs seek an order through the TRO and the PI to force the State to place their names on the ballot. The State opposes the motions.

The State alleges that it must mail ballots to overseas voters by April 10, 2017, to comply with state and federal law. (Doc. 15 at 14.) The State claims that approximately 39 out of Montana's 56 counties already had printed ballots in anticipation of the April 10, 2017, deadline at the time that Plaintiffs filed the Complaint in this case. *Id.* at 15. The State also asserts that 40 out of 56 counties had printed ballots by the time the State filed its Response to Plaintiff's Motion for a TRO. *Id.* The State claims that the counties that already have printed ballots would need 7 to 10 days to reprint ballots should the Court grant the Motion for a TRO. *Id.* The State claims the reprinting would cost the State $100,000. *Id*. at 17.

### III. Discussion

A plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest"

in order to obtain a temporary restraining order. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief constitutes an "extreme remedy" that never should be awarded as a matter of right. *Id.* at 22-24.

The State argues that Plaintiffs' requests for a mandatory injunction in the form of an order to print the names of Breck, Kelly, and Campbell on the ballot imposes a "doubly demanding" burden on Plaintiffs to establish the need for an injunction. (Doc. 15 at 18, 19, 22.), citing *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). The court in *Garcia* extrapolated that a plaintiff who requests a mandatory injunction "must establish that the law and facts *clearly favor* her position," on top of meeting the *Winter* standard. *Id.* (emphasis in original). The State argues further that an elevated standard should apply in this matter on the basis that Plaintiffs seek an injunction only a few weeks before the special election. *Id.* The State cites to *Feldman v. Reagan*, 843 F.3d 366, 375-75 (9th Cir. 2016), for the proposition that considerations particular to ongoing elections "often counsel restraint" when courts decide whether to enjoin an imminent election.

A state surely possesses valid and important interests in regulating elections. These interests include the ability to limit the number of candidates to avoid ballot overcrowding. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). A state can act to preserve the fairness and integrity of the electoral process. *Id., see also James v. Fortson*, 403 U.S. 431, 442 (1970). And finally a state may take

steps to avoid confusion, deceptions, or frustration of the democratic process. *Munro*, 479 U.S. at 193. In this regard, courts have noted "with unmistakable clarity" the right of a state "to require candidates to make a preliminary showing of substantial support in order to qualify for the ballot." *Id.* at 194. A state's ability to regulate remains far from absolute, however, as ballot access laws implicate the rights of people to associate for political purposes and the rights of qualified voters to cast their votes effectively. *Id.* at 193. The Court must balance these competing interests as it assesses the preliminary injunction criteria.

**A. Likelihood of Success on the Merits**

The parties dispute whether Plaintiffs have established a likelihood of success on the merits. The Court analyzes three separate factors in assessing Plaintiffs' likelihood of success on the merits.

1. Constitutional Framework

Courts have recognized that restrictions on ballot access interfere specifically with candidates' and political parties' "right to associate for political purposes" and with "the rights of qualified voters to cast their votes for the candidates of their choice." *Hall v. Merrill*, No. 2:13cv663-MHT (M.D. Ala. Sept. 30, 2016) (Thompson, J.), citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). Courts have adopted a sliding scale balancing test to address constitutional challenges to state election laws.

A court first must consider "the character and magnitude" of the burden on ballot access. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). A court "then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* A court must balance both parties' interests and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* The level of scrutiny varies depending on the character and severity of the burden imposed by the State. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-59 (1997); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Regulations that impose a severe burden on First and Fourteenth Amendment rights "must be narrowly tailored and advance a compelling state interest." *Timmons*, 520 U.S. at 358-59. Regulations that impose a lesser burden "trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.*

2. Regulatory Burden

The relevant inquiry to determine the severity of the burdens examines whether the State's "ballot access requirements seriously restrict the availability of political opportunity." *Arizona Green Party v. Reagan*, 838 F.3d 983, 989 (9th Cir. 2016), citing *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 762 (9th Cir. 1994). The plaintiff bears the initial burden of showing such restrictions. *Arizona*

*Green Party*, 838 F.3d at 989. A court should measure the burden "by whether, in light of the entire statutory scheme regulating ballot access, 'reasonably diligent' [parties] can normally gain a place on the ballot." *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) (internal citations omitted).

Plaintiffs argue that Montana's signature requirement represents a severe burden on their constitutional rights. Plaintiffs specifically argue that the combination of the short time frame for collecting signatures, the lack of preparation time in advance of the election, the occurrence of the signature gathering time in the middle of winter and during a period of low voter interest, and the expense of gathering 14,268 signatures render the signature requirement a severe burden. (Doc. 4 at 10-13.)

Plaintiffs cite *Hall v. Merrill*, No. 2:13cv663-MHT (M.D. Ala. Sept. 30, 2016), in support of their arguments. The plaintiffs in *Hall* brought an as applied challenge to Alabama's 3 percent (5,938 signatures) signature requirement for independent and minor party candidates in the context of a special election. The special election was called to fill a vacant seat for the United States House of Representatives, similar to the election at issue. The court in *Hall* granted summary judgment to the plaintiffs. The court cited as support the shortened time to collect signatures in a special election, little to no preparation time for a signature drive, the off year nature of the special election, and little historical evidence that gaining

access to the ballot as an independent or minor party candidate proved practically possible in a special election. *Id.* at *47-*48. The court determined that these factors constituted a severe burden. *Id.* at *47.

It should be noted, however, that the court previously had denied plaintiffs' motion for a temporary restraining order or preliminary injunction before the special election. *Id.* at *17-*18. The court emphasized the risk of voter confusion, among other matters, as the factor that warranted restraint in deciding on the relief sought by the plaintiffs. *Id.* The court granted summary judgment to the plaintiffs nearly three years after the special election.

Plaintiffs also marshal *Jones v. McGuffage*, 921 F. Supp. 2d 888 (N.D. Ill. 2013), in support of their argument. The court in *Jones* struck down Illinois's 5 percent signature requirement in the context of a special election for the United States House of Representatives. The court granted a preliminary injunction to the plaintiffs in *Jones* that reduced the signature requirement from 15,682 to 3,444. *Id.* at 903. The court granted the preliminary injunction on the basis that independent and minor party candidates faced substantial burdens. These burdens included a shortened time window to obtain signatures (62 days), the absence of any time to prepare a signature gathering effort, and the harsh winter conditions that occurred during the signature gathering period. *Id.* at 898-99. The ballot access scheme and the factual context in *Jones* closely resemble the facts and issues presented in this

case. The court in *Jones* refused plaintiffs' request to place their names on the ballot. (Doc. 15 at 25-26.) The court emphasized that placing names on the ballot would undermine the state's rights to require a showing of a modicum of support for candidates. *Id.*, citing *Jones*, 921 F. Supp. 2d at 902. The court decided, therefore, merely to reduce the number of signatures required.

Plaintiffs argue that Montana law represents a severe burden partially due to the shorter time frame allotted for signature gathering than had been allotted in *Jones* or *Hall*. Plaintiffs assert that they had five days to collect signatures between when Representative Zinke's vacancy occurred (March 1, 2017), and when nominating petitions were due (March 6, 2017). (Doc. 4 at 10-11.) Plaintiffs argue, in the alternative, that candidates had at most 46 days to collect signatures. This 46-day period ran between the date when the Montana Secretary of State posted necessary forms for the possible special election (January 19, 2017), and when nominating petitions were due on March 6, 2017. *Id.* at n.5.

The State argues that Breck, as the Green Party nominee, needed to collect only 5,000 signatures to gain ballot access. (Doc. 15 at 23.) The State also argues that candidates actually had somewhere closer to 75 days to collect signatures. *Id.* at 11. The State relies on the fact that at least one news outlet reported on December 21, 2016, that candidates would need to collect 14,268 signatures. This date fell 75 days before the deadline to submit signatures. The State reasons that

the fewer number of signatures required for Breck and the longer timeframe available to potential candidates combine to reduce the burden. The State could point to no court decision, however, that suggested putative candidates should start collecting signatures based on the mere possibility of an election.

Plaintiffs next argue that Montana's ballot access laws constitute a severe burden based on the lack of preparation time in advance of the special election. (Doc. 4 at 11-12.) Plaintiffs contend that successful, large-scale signature drives require significant lead time. Plaintiffs presented the testimony of Bill Pfeiffer, a professional signature drive organizer.  TT Draft, April 4, 2017, at 33-34. Pfeiffer testified that special elections, like the one at issue, afford no preparation time in comparison to the unlimited period afforded in regular elections. Pfeiffer testified about the substantial organizing efforts needed to mount a successful signature gathering campaign. Pfeiffer testified that a diligent worker could gather between 10 to 15 signatures per hour. *Id.* at 27. In this light, Pfeiffer opined that this type of effort would have been futile given the constraints of the special election schedule. *Id.* at 33.

The court in *Hall* highlighted lack of lead time in evaluating the severity of the burdens. The court cited the lack of lead time as part of the analysis, even though the outgoing representative in *Hall* had announced his retirement six months in advance. (Doc. 4 at 12.) The Illinois legislature in *Jones* passed a one off law that

shortened the time frame in which to conduct the special election to coincide with a Chicago municipal election, as the municipal boundaries encompassed much of the congressional district. *Jones*, 921 F. Supp. 2d at 891. This coordination of elections likewise reduced the time period to collect signatures in *Jones* to 62 days in December 2012 and January 2013. Former Representative Zinke announced his resignation only 5 days before signatures were due with the Montana Secretary of State.

Plaintiffs argue that low voter interest due to the off year nature of the special election compounds the challenge for independent and minor party candidates. Plaintiffs add that the occurrence of the election in the harsh winter season heightens the severity of the burden. *Id.* Plaintiffs emphasize that Alabama conducted the special election in *Hall* in an off year, but that the signature gathering period took place in the summer. The potential signature gathering period for Plaintiffs ran either from January 2017 to early March 2017 when the Montana Secretary of State published the election handbook, or solely during early March 2017, after Representative Zinke resigned, depending on one's conception of the signature gathering time frame.

Plaintiffs argue that the winter "poses obvious challenges for signature-gatherers that do not exist in the regular election cycle, when candidates can collect signatures until late May." *Id.* Pfeiffer testified that Montana's winter conditions

during the signature gathering would have presented a formidable obstacle for even a professionally organized signature drive. TT Draft, April 4, 2017, at 27, 33. *Jones* accounted for the difficulties posed by a harsh winter, even though the special election at issue there fell in a regular election year. Plaintiffs claim that the burdens here prove more substantial than in *Jones* and *Hall* as the signature gathering period occurred during an off year and during the winter months.

Plaintiffs further contend that the expense of mounting this signature campaign adds to the severity of the burden imposed by the State. *Id.* at 12-13. Plaintiffs claim that the three independent and minor party candidates at issue qualify as indigent. They could not have afforded to pay the professional signature gatherers who would have been required in order to meet the signature quota. Fundraising or training volunteers to gather signatures would have taken time that candidates lacked. The three candidates in *Jones* also claimed lack of money as a justification for their failure to comply with Illinois's 5 percent signature requirement. The Green Party in *Jones* dismissed the signature requirement as a "fool's errand" on the basis that the signature gathering period took place so soon after the 2012 general election. Jones, 921 F. Supp. 2d at 892.

Plaintiffs also point to the history of ballot access in Montana and nation-wide to support their argument regarding the severity of the burden. (Doc. 4 at 13.) Plaintiffs posit that no congressional candidate in the state of Montana ever has

gathered 14,268 signatures to qualify for placement on the ballot, even in a regular election. (Doc. 9, at 2, Declaration of Richard Winger.) Plaintiffs also claim that only six minor party or independent congressional candidates in American history have been able to collect over 10,000 signatures for the purpose of gaining ballot access. *Id.* This same expert, Richard Winger, testified in *Jones* that only three congressional candidates ever had collected more than 10,000 signatures to gain ballot access in a special election. *Jones*, 921 F. Supp. 2d at 893. Winger further opined in *Jones* that most states require only 5,000 signatures for congressional seats in special elections. *Id.*

In this context, Montana's signature requirement represents a severe burden to ballot access. Alabama's signature requirement of 5,938 signatures imposed a severe burden in a special election. *Hall*, No. 2:13cv663-MHT at *9, *47-*48. Montana law requires independent and minor party candidates to collect more signatures than in *Hall*—5,000 signatures for minor party candidates who go through the qualifying process and 14,268 signatures for independents.

The timeframe allowed for collecting signatures in the instant case—whether it was 46 or 5 days—proves shorter than the timeframe for signature collecting in *Hall* or *Jones.* The Court agrees that the compressed timeframe of no more than 46 days for signature gathering, due to the uncertainty that candidates faced before the Montana Secretary of State posted official special election nomination forms to his

14

office's website on January 19, 2017, imposed a severe burden on Plaintiffs' right to ballot access. The off year nature of this special election and the winter conditions faced by signature gatherers further highlight the severe burdens imposed by Montana's ballot access laws as applied to Plaintiffs in this special election.

### 3. State Interests and Narrow Tailoring

Montana's ballot access scheme must be narrowly tailored to serve a compelling interest in order to survive Plaintiffs' challenge. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The State has offered the Montana public's "substantial interest in the stability of its electoral system in the final weeks leading to an election" as a compelling interest. (Doc. 15 at 29, citing *Lair v. Bullock*, 697 F.3d 1200, 1202 (9th Cir. 2012)). *Lair* addressed a challenge to Montana's campaign contribution limits on First Amendment grounds. The district court struck down the limits as violating the First Amendment rights of contributors and enjoined their enforcement during the 2012 general election. *Id.* The Ninth Circuit acknowledged the State's "substantial interest" in stability of the electoral system when it imposed a stay on the district court's injunction against the enforcement of Montana's campaign contribution limits. *Id.*

The Court bears in mind that heightened standards apply in this matter due to the requested mandatory injunction and the quickly approaching election. The

Court agrees that the State possesses a compelling interest in the stability of the electoral system, especially when the special election proves imminent. Under these circumstances, however, Montana's ballot access laws for special elections as applied to Plaintiffs cannot be described as narrowly tailored.

Courts have described a 5 percent signature requirement in the context of regular general elections as a "rather minor burden." *See, e.g.*, *Jenness v. Fortness*, 403 U.S. 431, 433 (1979). Plaintiffs do not seek ballot access in a regular general election. In fact, Danielle Breck, a political organizer for Montana's Green Party, testified that the Green Party already had started to organize a signature campaign to gain ballot access for the 2018 general election. TT Draft, April 4, 2017, at 41, 45. This effort highlights the scope of the burden that Montana's ballot access laws for special elections pose for independent and minor party candidates.

**B. Other Preliminary Injunction Factors**

Plaintiffs represent that political and voting harms prove especially permanent and weighty due to the cornerstone nature of voting rights in American democracy. *Id.* at 16, citing *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1962). Plaintiffs also contend that courts cannot "relevel the playing field" for minor party and independent candidates after an invalid election. Plaintiffs urge the Court to determine, therefore, that they would suffer irreparable harm should the Court fail to place their names on the ballot. The State makes limited effort to rebut

Plaintiffs' claims of irreparable harm. The Court agrees with Plaintiffs and determines that they would suffer irreparable harm if the State were permitted to enforce the 5 percent signature requirement in this special election.

The Court must consider the TRO's effect on the public interest. Plaintiffs claim that the public would benefit from the TRO on the basis that it would afford Montana voters more candidate choices. (Doc. 4 at 18.) Plaintiffs cite *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), for the proposition that the public has an interest in choosing from a broad selection of candidates. The relevant excerpt from *Purcell* reads that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote." *Id.* The Court so reasoned in the context of describing the danger of voter fraud. The contrasting context in *Purcell* limits its relevance to the matter at issue.

The State relies on *Lair* to argue that the public possesses a "substantial interest in the stability of its electoral system in the final weeks leading to an election." Doc. 15 at 29, citing *Lair v. Bullock*, 697 F.3d at 1202. The Court in *Lair* stayed an injunction that would have prevented enforcement of Montana's campaign contribution limits on the eve of an election. The Court reasoned that the public possesses a "deep interest in fair elections" and that the existence of "well-laid and understood ground-rules" contribute to fairness in an election. *Id.* at 1215.

The State argues that to add Plaintiffs' names to the ballot at this late date likely would confuse voters and undermine the stability of the electoral system at a critical time. The plaintiffs' expert in *Jones*, Mr. Winger, the same expert used by Plaintiffs, testified in *Jones* that listing more than 8 candidates for one office on a ballot correlates with vote confusion. *Jones*, 921 F. Supp. 2d at 901. The Republican, Democratic, and Libertarian parties each have a candidate on the ballot in the special election to replace Representative Zinke. Plaintiffs seek to add three more. Plaintiffs' counsel argued that the timely filing of the nominating petition by each of the Plaintiffs should qualify them for the ballot. Plaintiffs' counsel argued that a fourth person, not party to this litigation, who also timely submitted a nominating petition without the requisite signatures, should not be added due to his failure to join this litigation. The addition of the three Plaintiffs would leave six candidates on the special election ballot. This number falls below the level cited for raising the potential of voter confusion. *Id.*

A careful review of the facts and reasoning in *Jones* assist the Court as it weighs the competing harms to the State and to Plaintiffs that would result from the Court's decision. Plaintiffs argue that they stand to be "shut out of the political process" should the Court deny the Motion for a TRO. (Doc. 4 at 17.) Plaintiffs represent that the State likely will not suffer any harm if the Court grants the TRO. They claim that time still remains to place the names of Breck, Kelly, and

Campbell on the ballot. Plaintiffs also contend that the injunction would not cause any delay in sending overseas ballots as long as the Court promptly issues the TRO.

The State claims that Plaintiffs lack an equitable advantage on the basis that they failed to demonstrate diligence and failed to bring this lawsuit in a timely manner. The Court disagrees. Plaintiffs filed this action shortly after the deadline for filing nominating petitions with the Montana Secretary of State. The Court rejects the notion that Plaintiffs slept on their rights and further determines that the State's enforcement of the 5 percent signature requirement as applied to Plaintiffs unlawfully would limit their access to the ballot in violation of their First and Fourteenth Amendment rights. This determination requires the Court to consider an appropriate remedy.

**C. Remedy**

*Jones* emphasized that states possess a compelling interest in requiring putative candidates to demonstrate a modicum of support before gaining ballot access. *Jones*, 921 F. Supp. 2d at 902. The three candidates in *Jones* stood in similar positions to Breck, Campbell, and Kelly on this criteria. The first candidate, Jones, failed to conduct any signature drive. He attempted instead to use social media to generate support. *Jones*, 921 F. Supp. 2d at 892. The Green Party candidate did not participate directly in any signature campaign, but offered, with

19

no concrete support, that local activists supposedly were collecting signatures. *Id.* Finally, the third candidate, Lewis, had run unsuccessfully in the November 2012 election. He confessed to being out of money and unable to replicate his earlier efforts so soon after his failed 2012 campaign. Lewis managed to collect 645 signatures despite these obstacles and the bad weather faced by canvassers. *Id.*

Plaintiffs made negligible efforts to collect valid signatures in anticipation of the deadline. (Doc. 15 at 26-27.) The testimony of Breck, Campbell, and Kelly demonstrates that the candidates collected 10, a few hundred, and zero signatures, respectively. TT Draft, April 4, 2017, at 43, 52, 58. Plaintiffs have failed to establish a modicum of support through their signature gathering efforts. Plaintiffs seek to rely on evidence other than collected signatures to establish a modicum of support.

Justice Powell determined in *McCarthy v. Briscoe*, 429 U.S. 1317 (1976) (Chambers Opinion), that a court can rely on other types of evidence when a state completely forecloses ballot access to independent and minor party candidates. *McCarthy* concerned a Texas ballot access law that made the signature gathering nomination process unavailable to independent and minor party candidates. *Id.* at 1322. Justice Powell ordered Texas to place former Senator Eugene McCarthy on the presidential election ballot for the 1976 general election.

Justice Powell justified his order by pointing to McCarthy's past electoral success, including his 1968 Democratic primary challenge to President Lyndon Johnson that forced President Johnson to withdraw his candidacy. Justice Powell also cited McCarthy's election to the United States House of Representatives for 5 terms, his election to the United States Senate for 2 terms, and McCarthy's national notoriety based on his lifetime in public office. *Id.* These factors established a modicum of support for McCarthy's candidacy and warranted the unusual step of requiring the state of Texas to place his name on the presidential election ballot.

*McCarthy* supports consideration of alternative showings of support when the State offers no official avenue, through signature collection or otherwise, to demonstrate support. *Id.* None of the Plaintiffs can point to similar alternative evidence of support. None of the Plaintiffs ever has held public office of any kind at any level. None of the Plaintiffs testified as to being well known in Montana. And only Kelly previously has run for public office. He testified to having received 9 percent of the vote in the 1994 elections as an independent candidate for the United States House of Representatives and 33 percent as a Republican candidate for the Gallatin County Commission in 1998. TT Draft, April 4, 2017, at 55. This record falls well short of the modicum of support for McCarthy suggested by his past electoral success.

The timeframe presented by Montana's special election proves particularly problematic. *Jones* once again provides valuable context. Representative Jesse Jackson resigned his congressional seat on November 21, 2012. The Illinois legislature passed its one off law to set the general election for April 9, 2013. *Jones*, 921 F. Supp. 2d at 891. The plaintiffs filed an action for declaratory and injunctive relief on December 17, 2012. The plaintiffs sought an injunction against enforcement of Illinois's special election law and an order to place the candidates on the ballot. The plaintiffs asked, in the alternative, for the court to lower Illinois's signature requirement to 525. *Id.* Six weeks later, on January 30, 2013, the court conducted an evidentiary hearing.

The court granted the plaintiffs' motion for alternative relief by enjoining enforcement of the election law to the extent that it required more than 3,444 signatures. The court derived this figure first by reducing the signature requirement to the 5,000 total used by Illinois for candidates in elections after redistricting years. The court next reduced this 5,000 figure to reflect the shortening of the signature gathering period for this special election from 90 days to 62 days. The court's order on February 1, 2013, left the plaintiffs with 3 days to meet the February 4, 2013 deadline. *Id.* at 903.

The court declined to place the candidates on the ballot without each of them having demonstrated a modicum of support by satisfying the more reasonable

signature threshold. *Id.* at 903. The court reasoned that allowing the candidates to be placed on the ballot without any signature requirement would "fly in the face" of the Supreme Court's repeated refrain that states possess a valid, even "compelling" interest in requiring candidates to demonstrate a modicum of support before being placed on the ballot. *Id.* The court further recognized that, for all practical purposes, none of the plaintiffs would qualify for the ballot. The court declined to play a role "to help any particular candidate get on an election ballot." *Id.* The court instead understood it functioned "to make sure that the state does not erect insurmountable barriers to ballot access." *Id.*

Breck, Kelly, and Campbell conceded that they failed to pursue any meaningful signature gathering effort. They likewise have failed to present other evidence that would help establish a modicum of support for the appearance on the ballot. They have failed to persuade the Court to take the unusual step of ordering the State to place their names on the ballot. As noted in *Jones*, a state retains the right to require that candidates demonstrate a modicum of support before being placed on the ballot. Plaintiffs have failed to demonstrate a modicum of support for their candidacies either through a reduced signature gathering effort as noted in Jones, or even through the other indicia of support relied upon by Justice Powell in *McCarthy*, such as past electoral success, or statewide name recognition.

.

As a result, the Court declines to order the State to place the names of Plaintiffs on the ballot as a matter of right. *Winter*, 555 U.S. at 22-24. The Court instead must determine some figure that would approximate a "substantial modicum of support" in light of the constraints imposed by Montana's special election schedule. *Jones*, 921 F. Supp. 2d at 902. The Court acknowledges that any figure would be arbitrary, but will endeavor to develop a figure that reconciles Montana's right to impose the standard 5 percent requirement under normal circumstances and the unusual circumstances presented by Montana's special election.

Plaintiffs testified that they were indigent in terms of mounting a signature gathering campaign. The State provided no evidence to counter this claim. Nothing prevented Breck, Campbell, or Kelly, however, from collecting signatures on their own. The Court agrees with Plaintiffs that the special election remained in doubt until Secretary Zinke resigned his position on March 1, 2017, and Governor Bullock called for the special election that same day. Nominating petitions with signatures were due on March 6, 2017. Plaintiffs timely filed their nominating petitions. Plaintiffs' witness Pfeiffer testified that a diligent canvasser could collect 10 to 15 signatures per hour. The State once again presented no evidence to counter this claim.

It seems reasonable, therefore, to require a candidate to work for 8 hours each day during the 5-day window between March 1, 2017, when Secretary Zinke resigned and March 6, 2017, when nominating petitions were due. A diligent candidate could collect 10 to 15 signatures per hour, according to Plaintiffs' witness Pfeiffer. TT Draft, April 4, 2017 at 27. The Court will use the lower rate of 10 to account for the off year nature of the special election and the winter conditions likely encountered by candidates during the March 1, 2017, through March 6, 2017, period. At this rate, a diligent candidate, working on his or her own, could collect 400 signatures over the 5 days. This figure will substitute in this instance for the 5 percent standard required by the State for general elections. Any inability by a candidate to attain this level cannot fall on impediments raised by the State.

## IV. Conclusion

The Court determines that Montana's 5 percent signature requirement for a special election severely burdens the constitutional rights of ballot access for independent candidates and minor party candidates. The State's interest in seeking to impose order on the election process must give way to a candidate's right to ballot access in light of the truncated time frame to gather signatures, the prohibitive costs of such a concentrated signature gathering process, and the other unique problems posed by special elections.

Accordingly, **IT IS ORDERED:**

The Court **GRANTS** Plaintiffs' motion for Temporary Restraining Order and Preliminary Injunction (Doc. 3) and enjoins the State from enforcing Montana's ballot access laws to the extent that it requires an independent or minor party candidate to obtain in excess of 400 valid signatures in order to appear on the ballot for the May 25, 2017, special election for the United States House of Representatives.

DATED this 8th day of April, 2017.

_____
Brian Morris
United States District Court Judge